**UNITED BANKERS MUT. LIFE INS. CO.**
**v. CLEMONS et al.**

No. 15151.

Court of Civil Appeals of Texas.
Fort Worth.

July 14, 1950.

Rehearing Denied Sept. 15, 1950.

Boling, Smith & Allen and John Lee Smith, all of Lubbock, for appellant.

Bullington, Humphrey, Humphrey & Fillmore and Leslie Humphrey, all of Wichita Falls, for appellees.

HALL, Justice.

Appellees, hereinafter named, purchased from appellant a combination life insurance policy and a contract to purchase stock in appellant company. The policies, designated as Special Patron's Investment Policies,

were issued as follows: Barney C. Clemons, No. 588, issued on June 25, 1948, in the sum of $25,000, with initial premium of $2,198.-50; Roy Harrison King, No. 598, in the amount of $25,000, issued on June 10, 1948, with initial premium of $1,921; Albert Adolph Brockriede, No. 583 for $12,500, issued on June 24, 1948, and another policy No. 584 of like amount, bearing same date, with aggregate initial premium of $1,803.26; William Henry Moeller, No. 616, in the amount of $25,000, dated July 19, 1948, with initial premium of $2,072.50; Carl Herman Moeller, No. 582, in the amount of $25,000, dated June 26, 1948, with initial premium of $1,854.75; and Lorenz H. Klinkerman, No. 627, in the amount of $25,000, dated September 15, 1948, with initial premium of $3,-056.25. All of said purchases were made in Wichita County, Texas.

On April 30, 1949, the above appellees sued appellant in a district court of Wichita County for rescission and cancellation of said policies and contract to purchase stock and seeking return of their money.

The trial court on January 24, 1950, entered its judgment in response to jury findings in favor of appellees and against appellant for the full amount of the money which appellees had paid to appellant.

Appellant's appeal consists of 55 points. They will be discussed in group form.

We will relate a brief resume of appellees' cause of action, together with testimony most favorable to the trial court's judgment.

Appellant is a mutual life insurance company organized under Chapter 7, Title 78, of our insurance laws, beginning with Article 4800, Vernon's Ann.Civ.St., as amended. D. J. Willmon, President of appellant Company, testified he filed the charter in 1946 and amended same in 1947. Willmon further testified that as of December 31, 1946, the Company had total assets of $10,-734.52; that in December, 1949, it showed total assets of $215,368.41. That appellant Company was paying him an annual salary of $18,000 a year; that said Company was paying its agents 75 per cent of the gross premiums; that at the end of 1949 it had insurance in force of approximately three and one-half million dollars. Each one of

the Company's agents was furnished a copy of Article VIII of the Articles of Incorporation, which reads as follows: "Each policyholder shall be entitled to one vote for each five hundred (500) dollars of insurance held by him. Any policyholder may execute his proxy authorizing and entitling the holder to exercise his voting powers, unless such proxy shall be revoked not less than ten (10) days previous to any annual or special meeting of the policyholders. Policyholders in this company shall have the rights and benefits as hereinafter provided: If this Company is converted into a stock company, or if a stock company is organized for the purpose of reinsuring this company, the policyholders of this company shall be given the right to purchase a maximum of ten (10) shares of stock in either of said companies for each one thousand (1000) dollars of insurance in force in this company, at twenty (20) dollars per share. The company will give written notice to each policyholder entitled to purchase such stock at the last known address shown by the Company's records, and such policyholders shall have thirty (30) days from date of notice to purchase the number of shares to which they are entitled. After thirty (30) days from date of written notice, the right to purchase shall expire."

Appellees' causes of action are founded upon fraud perpetrated by appellant's agents with knowledge and consent of appellant, wherein they were induced to purchase said combination insurance and contract to purchase stock by the representation of appellant's agents that if they would buy a substantial policy they would have a right, under the policy, to also purchase stock in the company, as set out by said Article VIII, supra; and that said company was going to convert into a stock company not later than the early part, or spring, of 1949; that the value of said stock at the time of purchasing the contract was $30 per share and that by the time of conversion in the spring of 1949 it no doubt would be worth $60 per share, but that they would purchase their stock at par value of $20 a share. There is substantial testimony from all appellees and from appellant's agents to the effect that such conversations did take place, except

agents of appellant testified that the conversion would take place not later than 12 or 18 months from date of purchase by appellees.

It is undisputed that appellees informed appellant's agents they were not interested in insurance but were interested in buying said stock. Appellant's agent admitted that one of the appellees told him if the stock had an increase in value of $5 per share it was worth buying; appellees testified they would not have bought the contract of insurance if it had not been for the fact they could not buy the stock without it, under Article VIII, supra.

The jury returned favorable answers to issues submitted for appellees, substantially as follows: That appellant's agents represented to each of appellees before they purchased their policies of insurance and contract to purchase stock that all arrangements had been made by appellant to convert into a stock company on or before the spring of 1949; that the only way appellees could purchase the stock was to purchase the policies of insurance in question; that value of stock to be issued was $30 per share and at the time of issuance it would be worth $58 per share; that appellant's agents represented to appellees that $1250 of the purchase price on premiums so paid by appellees could be used for the purchase of stock in said Company; that the insurance policy was the cheapest insurance that could be purchased by appellees; that the agents of said Company further represented to appellees the stock of its Company had a present value in dollars and cents per share; that all of such representations so made by appellant's agents to appellees were false; that appellees relied upon said representations; that appellant's president D. J. Willmon had knowledge of such representations, acquiesced therein, consented to the representations so made and ratified same.

Under appellant's points 1 to 24, it argues this case should be reversed and rendered on the ground that appellees are estopped from recovery upon their causes of action because each of them acknowledged receipt of their policies and retained same. It cites such cases as Ribble v. Roberts, Tex.

Civ.App., 180 S.W. 620; New York Life Insurance Co. v. Miller, 11 Tex.Civ.App. 536, 32 S.W. 550; 24 Tex.Jur., p. 657; American National Insurance Co. v. Huey, Tex.Com.App., 66 S.W.2d 690, and many others which support appellant's contention that ordinarily the insured is estopped from rescission of a contract by not rejecting same immediately upon its receipt, that the mere soliciting agent of a life insurance company does not have authority to make a contract in the company's behalf concerning the payment of premium installments or disposition of the dividends, etc., under Revised Civil Statutes, Article 5063, and that no oral statement, representation or promise made by the agent in question can vary terms of the contract. Such is the holding in Colorado Life Co. v. Sweat, Tex. Civ.App., 154 S.W.2d 295. All of appellant's authorities, however, are based upon insurance contracts alone. However, be that as it may, the jury found in this case that appellant Company acquiesced in the misrepresentations made by its agents to appellees and that such company did ratify the same; under such state of facts if the testimony is sufficient to support this finding then the statutes which appellant relies upon are not in effect, because the general rules of equity will not allow one to knowingly and willingly perpetrate legal fraud upon another.

Let us now review some of the testimony and circumstances most favorable to the court's judgment relative to appellant's acquiescing in the misrepresentations which the jury found its agents made to appellees. In this connection we might note the case of Mutual Reserve Life Ins. Co. v. Seidel, 52 Tex.Civ.App. 278, 113 S.W. 945, wherein the court held while the general rule is that a promise to perform some act in the future would not amount to fraud in the eyes of the law, and could not be made the basis for rescission, there is an exception to such rule recognized in this state that if at the time of such promise there was an intention to disregard and not perform it and it was only made to deceive and entrap the other party, such promise on nonperformance would amount to actual fraud as would justify the rescission of a contract induced

thereby. The facts in that case clearly indicated that promise to hold the note in question was made by the agent with no intention of doing so but with intention of fraudulently inducing the proposed insured to sign said application, which was borne out by the fact that the agent sold the note at once and disappeared. This case is in point since the jury found appellant acquiesced in the fraudulent representations of its agents.

It is also the thought of this court, from the facts in this case, wherein the cause of action is for rescission of a written contract, which is not based upon provisions of the policy itself but is founded upon fraudulent representations made to appellees in allowing them the privilege of purchasing stock on or before a certain date, there should be no reason why a different rule would apply than the one that applies to other torts. A corporation can only act through its agents, it must be responsible for their acts known to said corporation, if it were not responsible for their known false and fraudulent representations, those who deal with it would be practically without redress and it would be committing fraud with impunity.

We are also mindful of the general rule that parties should as near as possible be placed in status quo as a condition to rescind an insurance policy upon the ground of misrepresentations. However, such rule should be tempered with rules of equity so that the wrongdoer will not knowingly be permitted to take advantage of a situation his fraud has produced.

The testimony shows some of the appellees contacted appellant for a refund of their money prior to filing their law suits but appellant refused.

As to testimony connecting appellant with its agents' misrepresentations, we will quote from appellant's witness J. D. McBride, one of the agents who sold appellees the contract:

"Q. State to the jury in as much detail as you can what you told Mr. Clemons when you sold him this policy.

*    *    *    *    *    *

"A. Well, we told them that there was several of us had gotten together, that we had been working for numerous companies and that we decided to organize a company of our own and own part of it, which we worked out a plan on. And that—do you want me to go into the full details now?

*    *    *    *    *    *

"Q. Well, did you tell Mr. Clemons that the company would issue stock in the fall of '48, or the spring of '49? A. At that time, Judge, to the best of my knowledge, I told our clients that we planned to convert our company. In other words, that was from the conversation that we were talking about among ourselves as to our program, that we planned to capitalize the company within twelve to eighteen months.

*    *    *    *    *    *

"Q. Did you tell them that you would convert it in '49? A. I didn't tell them definitely. I might have said that. I don't remember, but, as I thought at that time, we would possibly convert it in '49."

Up until trial of the case, appellant's officers and directors had not called a policyholder's meeting in order to convert the company into a stock company. The president of the Company testified in substance that he had talked with his agents about the matter of discussing the stock feature with prospective customers, as outlined in Article VIII.

Another circumstance which the jury had a right to consider in determining whether or not the Company knew, or by reasonable diligence should have known, that its agents were making such representations is the fact that it had no assets and had written but very little insurance up until the latter part of 1946 and that since that time it had sold at least three and a half million dollars worth of insurance.

Another circumstance within the province of the jury to consider in determining such question is the fact that all of these policies purchased by appellees were in large sums and for the same amount, to-wit, $25,000.

There is nothing in the law to force this Company to convert into a stock company,

unless it be by the concerted efforts of the policyholders, which we are not at this time passing upon. Article 4802, Vernon's Ann. Civ.St., as amended, prescribes that the business of such a company shall be controlled and directed by a board of directors, who shall elect the officers of the company, the duties of such officers shall be prescribed by the by-laws and such by-laws shall be adopted by the board of directors.

Appellant's President D. J. Willmon testified that it was his original plan to write some insurance business on the books as a mutual and then convert it into a stock company. "Q. 'And that was the plan that was proposed to the various prospects that you sold insurance to, wasn't it?' Is that correct? A. Yes." He then admitted he had discussed the conversion plan with the two agents McBride and Daum, who sold the stock to appellees.

"Q. Well then, when you talked to them about getting new business, did you ever mention the fact that you were converting and you were going to have stock for sale? A. Yes, sir.

"Q. You did that? A. That was my intentions, to convert."

In this connection, among other things, one of appellant's agents testified that he told appellees as follows: " * * * Now, we tell them that our plan was to capitalize this company with so much insurance in force; and, if we could reach that goal, that the value of our corporation will naturally be more than what they pay for their stock. In other words, if we could put average premium income equivalent to around twenty million in insurance in force, that it would make our stock worth two and a half to three times its value. Now, that is the—is that detail enough, Judge?

"Q. Well, the whole feature, because you sold him this whole contract. A. All right, now, in the end, in my closing remarks of this contract, I tell them, tell my clients this; that here's what the proposition centers down to. You make an annual deposit with us of this much money, which you have this contract, and you have a cash coupon of $1250.00, which is the first one due the first day of the second contract

year. You have a modified whole life, but you get it net. And, when we issue this stock, you have a thirty-day option to buy twenty shares—ten shares per thousand, irrespective of what it is worth. * * *"

The facts in this case are somewhat similar to the facts outlined in the case of Bank Savings Life Ins. Co. v. Steiner, Tex.Civ.App., 81 S.W.2d 225, 227, wherein the court's summary is as follows: "As there is substantial evidence to show that the dominant purpose in securing the policy was the money-loan feature guaranteed by the policy, that appellant breached this provision, and that from such breach appellee suffered injuries that cannot be fully compensated in damages, and that appellant will be placed substantially in the same position it occupied at the time the contract was entered into, * * *."

We overrule the first 24 of appellant's points.

Appellant argues in its points 26 to 40, inclusive, the trial court erred in admitting testimony of Barney C. Clemons on direct examination to the effect that its agents orally offered a sale of stock in appellant Company. We overrule this contention because in our opinion this feature of the contract is not one of insurance but is strictly a contract to sell stock in the Company and therefore oral testimony is admissible to show the contract as written does not contain the provisions as agreed upon by the parties, and therefore admissible in rescinding a contract where fraud is laid. The whole scheme is, evidently, to further the sale of insurance and at the same time be protected under the law from rescission through certain statutes relating to the sale of insurance policies which provide that all of the contract must be in the written application and the written policy. Under the facts here, representations made with intention to deceive are actionable fraud and give right to rescission or cancellation of such a contract. See Article 4004, Vernon's Ann.Civ.St., and cases cited in Russell v. Industrial Transp. Co., 113 Tex. 441, 251 S.W. 1034, 258 S.W. 462, 51 A.L.R. 1.

We overrule these points of error.

Appellant's point 41 relates to error of the court in overruling its motion for a peremptory instruction. We overrule this contention.

Appellant has not briefed its points 25, 42, 43, and 48 and they are waived. Rayburn v. Giles, Tex.Civ.App., 182 S.W. 2d 9, writ refused.

Appellant's point 44 is designed to reflect error of the court in submitting special issue No. 6, which inquires of the jury whether or not appellant's agents, at the time or before one of the plaintiffs purchased his policy of insurance, represented to him that the stock of United Bankers Mutual Life Insurance Company then had a present value of dollars and cents, for the reason it implies the company is liable for the oral representations made by its agents. We have heretofore answered this argument and overrule same.

Appellant's point 45 complains of the trial court in refusing to submit its requested issue as follows: "Do you find from a preponderance of the evidence that any fraudulent representations were made by the defendant to the plaintiffs at the time of the delivery of said policy? * * *" This issue could be submitted wherein there is only an insurance policy involved, but we have here two contracts, interrelated, one for the sale of insurance and the other for the proposed sale of stock in the same company, and under such conditions we think the court was correct in rendering judgment under the findings of the jury as above outlined.

Appellant's point 46 relates to error of the court in failing to give defendant's special requested instruction as follows: "You are charged as a matter of law that the policies of insurance or the policies and applications therefor constitute the entire contract between the parties to the insurance contracts." As we have stated above, since the two contracts were so interrelated, that is, one for insurance and one for proposed sale of stock, we are of the opinion that the court did not err in rendering judgment therein.

The same answer will be sufficient to overrule appellant's point 47, because of its similarity with the subject matter raised in point 46.

Appellant's points 49 to 53 refer to error of the trial court in admitting the oral testimony of appellees, wherein they testified that its agents told them they were buying stock in the United Bankers Mutual Life Insurance Company by reason of the purchase of the policies and that said stock would be ready for delivery in the fall of 1948 or spring of 1949 because the alleged oral statements or representations made by Daum and McBride were not expressed in the policies of insurance. This argument has heretofore been answered by us, but we might add that since Article VIII of the United Bankers Mutual Life Insurance Company, appellant herein, was attached to and made a part of the policies, being page one, and the two contracts of sale were so interrelated, and since fraud in the contract to sell stock in the proposed conversion of said Company was based upon collateral and extrinsic representations of the following: (1) false statement as to the present assets and value of the proposed insurance stock; (2) false statement as to the date of conversion from a mutual company to a stock company; and (3) right of the policyholders to acquire stock at a set definite date in such stock company, we find under the particular facts in this case, viewing it as a whole, these points should be overruled.

Appellant's point 54 is founded upon the verdict not being supported by substantial evidence. This contention is overruled.

Appellant's point 55 is directed to error of the trial court in rendering judgment herein against it because the verdict is contrary to the evidence. This contention is overruled.

The facts in this case do not contravene Article 5053, Vernon's Ann.Civ.St., which prohibits discrimination in favor of insureds, for the following reasons: First, the last sentence of said Article reads as follows: "The company shall not be held liable under this article for any unauthorized act of its agent, *unless the company shall acquiesce in such action.*" (Emphasis

ours.) The jury found from a preponderance of the evidence in this case that the Company acquiesced in the fraudulent representations of its agents. Second, the contract which appellees entered into with appellant to purchase stock was not any special favor or advantage offered to appellees but such was a specific scheme which was offered to all clients of appellant. Third, the contract to sell stock in the Company was outlined in the policy and the law allowing rescission under fraud of such contract to sell stock is not governed by said article.

▮ We believe under the evidence in this case the insured, to-wit, appellees, brought this suit against appellant to rescind the contract as a whole within a reasonable time.

▮ We realize that a cause of action to rescind an insurance contract is one of equity and if this suit had been for the rescission of an insurance contract alone it might have been filed too late, but the contract of insurance was merely incidental to the contract to purchase stock and was interrelated with the same. The testimony shows that Hunter Jones, appellees' expert witness on life insurance companies, testified that the provisions of said policy are so unusual that it is difficult to interpret them. In answer to questions propounded to said witness as to his definition of the policy, he testified as follows:

"A.—name for the policy that would be published in the Unique Manual, which contains the majority of the policies that are handled by all of the 400 reputable life insurance companies of the United States. There is no name for it.

"Q. Did you ever see one just like it? A. I never did, no, sir.

"Q. Hasn't got any name in your vocabulary? A. No, sir, there is not a name for it."

He further testified in substance that for the same amount of money a person would be able to secure from the average insurance company a 20 year paid up policy for twice the amount of insurance and at least $5,000 more cash value than the policy which appellees purchased from appellant.

Finding no error, the judgment of the trial court is affirmed.